# Exhibit 47, Part 2

a total USD equivalent of $61.1 million.[208]  The trade was arranged by and "approved" by Solo Capital.



| From: | <solotradeapprovals@solo.com> |
| To: | <omitchell@ddccayman.com>, <poakley@ddccayman.com> |
| Cc: | <execution@fgcsecurities.com>, <operations@fgcsecurities.com>, <solotradeapprovals@solo.com> |
| Subject: | Account (DDC01) - Trade Approved |
| Sent: | Thu, 21 Mar 2013 13:12:15 +0000 |

Dear Client,

In relation to the trade referred to below (**Trade**), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis:

(i) You may seek liquidity for the Trade (via the Broker that you have identified), and

(ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) - partial execution of the Trade is not approved.

Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Trade:

| **Trade Type** | **Sell** |
| Ticker | CARLB DC |
| Instrument | Equity |
| Currency | DKK |
| Price | 586.3316 |
| **Quantity/Contracts** | 600,000 |
| Shapes | **Shape 1** 600,000 |
| Notional | 351,798,960.0000 |
| Trade Date | 21/03/2013 |
| Settlement Date | 27/03/2013 |
| Broker | FGC Securities LLC |

Client: D.D.C. Cayman

Broker: FGC Securities LLC

Trade Type: Sell

Ticker: CARLB DC

Instrument: Equity

Quantity: 600,000 shares

Price: DKK 586.3316

Notional: DKK 351,798,960.00

Trade Date: March 21, 2013

Settlement Date: March 27, 2013

**Figure 9 – Trade Confirmation from Solo Capital to D.D.C. Cayman[209]**

160.    As noted above, there is no evidence that D.D.C. Cayman ever actually owned these shares of Carlsberg since the sub-custodians acting for Solo Capital, who were supposedly acting as the custodian for the shares, have either affirmatively stated in sworn affidavits that they never had any record of the shares existing in their custody systems and/or provided

---

[208] ELYSIUM-01463929.
[209] ELYSIUM-01463929.

documents showing that no such shares existed in their share custody systems. Also as noted above, based on my thorough review of Solo Capital's business records, I have not seen any documentation reflecting the transfer of Carlsberg shares from the market into D.D.C. Cayman's account at Solo Capital.

        **b.**    **Trade Approval 2: The Bernina Plan purportedly purchased shares in Carlsberg from FGC Securities LLC in March 2013**

161.    On March 21, 2013, which is the same trade date – and only <u>5 seconds</u> after the D.D.C. Cayman transaction in the preceding step – the Bernina Plan purportedly purchased the same number of shares in Carlsberg at the <u>exact same price</u> from FGC Securities LLC, acting as broker.[210] It is apparent from the timing and details of this trade and the prior trade that the Bernina Plan purportedly purchased the Carlsberg securities from D.D.C. Cayman through the broker FGC Securities LLC.

---

[210] ELYSIUM-01463894.

| From: | solotradeapprovals@solo.com |
| To: | adam@Berninap.com |
| Cc: | execution@fgcsecurities.com, operations@fgcsecurities.com, solotradeapprovals@solo.com |
| Subject: | Account (BER01) - Trade Approved |
| Sent: | Thu, 21 Mar 2013 13:12:20 +0000 |

Dear Client,

In relation to the trade referred to below (**Trade**), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis:

(i) You may seek liquidity for the Trade (via the Broker that you have identified), and

(ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) - partial execution of the Trade is not approved.

Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Trade:

| Trade Type | Buy |
| Ticker | CARLB DC |
| Instrument | Equity |
| Currency | DKK |
| Price | 586.3316 |
| Quantity/Contracts | 600,000 |
| Shapes | **Shape 1** 600,000 |
| Notional | 351,798,960.0000 |
| Trade Date | 21/03/2013 |
| Settlement Date | 27/03/2013 |
| Broker | FGC Securities LLC |

Client: The Bernina Plan

Broker: FGC Securities LLC

Trade Type: Buy

Ticker: CARLB DC

Instrument: Equity

Quantity: 600,000 shares

Price: DKK 586.3316

Notional: DKK 351,798,960.00

Trade Date: March 21, 2013

Settlement Date: March 27, 2013

**Figure 10 – Trade Confirmation from Solo Capital to the Bernina Plan[211]**

162.    The use of the broker FGC Securities LLC has no apparent business purpose other than to create an air of legitimacy to the trade.  Typically, a broker serves in one or both of two capacities—execution of the trade in the market, and/or clearing the trade.  In the Solo Trades, the brokers only purported to function as an executing broker,[212] rather than as a clearing broker, as the Solo Custodians purportedly served as the clearing institutions. However, there was no need for an executing broker because the counterparties did not need

---

[211] ELYSIUM-01463894.
[212] Markowitz Tr. at 272:18 – 273:19 (discussing MPSKAT000010004 (Ex. 2143)); Lehman Tr. at 64:24 – 65:18.

to seek liquidity from the open market.  Rather, Solo Capital pre-selected the counterparties to each trade from among the counterparties that had "on-boarded" to the Solo Capital platform and determined the volume of each trade.  As a result, the brokers such as FGC Securities LLC served no legitimate function.[213]



**Figure 11 – The Bernina Plan Solo Trade**

        c.      **Stock Loan 1: The Bernina Plan purportedly loaned the Carlsberg shares it purchased to Colbrook Limited in March 2013**

163.    The Bernina Plan purportedly entered into a securities lending agreement with Colbrook Limited,[214] under which the Bernina Plan agreed to loan the very same shares in Carlsberg that it purchased from FGC Securities LLC.  The loan transaction settled on March 27, 2013, the same settlement date as the purported purchase of the shares.[215]

---

[213] Consistent with my conclusions on the role of the brokers in the Solo Trades, the Financial Conduct Authority in England has fined two of the purported brokers involved in the Solo Trades:  Sunrise Brokers and Sapien Capital Limited.  In each report on its findings, the FCA stated that it "refers to the Solo Trading as 'purported' as it has found no evidence of ownership of the shares by the Solo Clients, nor custody of the shares or settlement of the trades by the Solo Group. This, coupled with the high volumes of shares purported to have been traded, is highly suggestive of sophisticated financial crime." *See* Financial Conduct Authority, Final Notice to Sapien Capital Limited, May 6, 2021; Financial Conduct Authority, Final Notice to Sunrise Brokers LLP, November 12, 2021.
[214] Colbrook Limited was one of eight stock loan counterparties for which Martin Smith was a shareholder and director.  Smith was also employed by Novus Capital Markets, a purported broker for the Solo Trades.  See paragraph 109.
[215] ELYSIUM-01487961.

| From: | <solotradeapprovals@solo.com> |
| To: | <adam@Berninap.com> |
| Cc: | <solotradeapprovals@solo.com> |
| Subject: | Account (BER01) - Trade Approved |
| Sent: | Tue, 26 Mar 2013 13:52:58 +0000 |

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| **Trade Type** | | |
|---|---|---|
| **Ticker** | CARLB DC | Client: The Bernina Plan |
| **Instrument** | Equity | |
| **Currency** | DKK | Counterparty: Colbrook Limited |
| **Price** | 586.3316 | |
| **Quantity/Contracts** | 600,000 | Trade Type: Stock Loan |
| **Shapes** | **Shape 1** 600,000 | |
| **Notional** | 351,798,960.0000 | Ticker: CARLB DC |
| **Trade Date** | 26/03/2013 | |
| **Settlement Date** | 27/03/2013 | Instrument: Equity |
| **Side** | Lend | |
| **Haircut** | None | Quantity: 600,000 shares |
| **Term** | Open | |
| **Cash Rebate Interest** | Overnight DKK Libor | Price: DKK 586.3316 |
| **Cash Rebate Spread** | +70 | |
| **Stock Rebate Interest** | Overnight DKK Libor | Notional: DKK 351,798,960.00 |
| **Stock Rebate Spread** | +19.75 | |
| **Cash Pool Type** | fixed | Trade Date: March, 26, 2013 |
| **Dividends** | 100% | |
| **Counterparty** | Colbrook Limited | Settlement Date: March 27, 2013 |

**Figure 12 – Stock Loan Confirmation from Solo Capital to the Bernina Plan**[216]

164.    As part of the loan transaction, Colbrook Limited agreed to provide cash collateral to the Bernina Plan representing the full market value of the shares borrowed.  However, the stock price (and therefore the amount of collateral provided by Colbrook Limited) that the loan agreement was premised on was the price that the Bernina Plan had purchased the shares from D.D.C. Cayman on March 21, 2013 – rather than the market price as of the date of the stock loan on March 26, 2013.

---

[216] ELYSIUM-01487961.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 53

165.    Furthermore, the stock loan step in each of the Solo Trades takes place at the same price the security was purchased at (several days earlier), rather than at the market price as of the date of the stock loan.  And regardless of what actually happened in the market to the stock price between the purchase date and the stock loan date, the purported stock lender in the Solo Trades would always enter the loan transaction based on the purchase price from days earlier.

166.    This does not comport with how securities lending works in the real world.  The price of the Carlsberg shares between March 21, 2013 and March 26, 2013 could have certainly moved during that period, which would impact the pricing and related terms of the stock loan transaction.  The stock loan transactions in the Solo Trades never took such market movements into account.

167.    In fact, the closing stock price of Carlsberg on March 26, 2013 declined by DKK 13.33 per share since the purported stock purchase on March 21, 2013.[217]  As a result, the total market value of the 600,000 shares that the Bernina Plan purportedly loaned to Colbrook Limited would have declined by DKK 7,998,960 (or approximately USD $1.4 million).  Given that the collateral purportedly provided by Colbrook Limited was based on the stock price as of March 21, 2013 rather than March 26, 2013, the drop in the stock price between the two dates resulted in Colbrook Limited purportedly providing the Bernina Plan with approximately DKK 8.0 million in excess collateral.

---

[217] http://www.nasdaqomxnordic.com/shares/historicalprices (last visited December 28, 2021).

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 54



**Figure 13 – The Bernina Plan Solo Trade**

168.    I have reviewed the Solo Capital account statement for the Bernina Plan, which statement shows that the Bernina Plan deposited no funds into its Solo Capital trading account prior to its purported purchase of the Carlsberg securities, and had a zero cash balance at the time of the purchase. [218]   The purpose of the stock loan was to ostensibly show that the Bernina Plan, a newly formed entity, had sufficient liquidity, via the cash collateral it purportedly received from Colbrook Limited, to actually fund the purchase of DKK 351,798,960.00 worth of Carlsberg stock at settlement on March 27, 2013.[219]

              d.    **Stock Loan 2: Colbrook Limited purportedly loaned the Carlsberg shares it borrowed to D.D.C. Cayman**

169.    Colbrook Limited then simultaneously loaned the same shares that it just borrowed from

---

[218] See **Table 1**.
[219] As of March 27, 2013, the Bernina Plan had a bank account balance of only $5,000 in its JPMorgan Chase account, *see* MPSKAT00001580 at 1581.  Not only would that balance be entirely insufficient to fund the stock purchase, it was also never transferred to the Solo Capital account.

the Bernina Plan to D.D.C. Cayman.[220]  The trade approval email for this transaction was sent just 1 second after the stock loan transaction it purportedly entered with the Bernina Plan.[221]



| | | | |
|---|---|---|---|
| From: | <solotradeapprovals@solo.com> | | |
| To: | <martin.smith@colbrooklimited.com> | | |
| Cc: | <solotradeapprovals@solo.com> | | |
| Subject: | Account (COL01) - Trade Approved | | |
| Sent: | Tue, 26 Mar 2013 13:52:59 +0000 | | |

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| | | |
|---|---|---|
| **Trade Type** | | Client: Colbrook Limited |
| **Ticker** | CARLB DC | |
| **Instrument** | Equity | Counterparty: DDC Cayman Limited |
| **Currency** | DKK | |
| **Price** | 586.3316 | Trade Type: Stock Loan |
| **Quantity/Contracts** | 600,000 | |
| **Shapes** | **Shape 1** 600,000 | Ticker: CARLB DC |
| **Notional** | 351,798,960.0000 | |
| **Trade Date** | 26/03/2013 | Instrument: Equity |
| **Settlement Date** | 27/03/2013 | |
| **Side** | Lend | Quantity: 600,000 shares |
| **Haircut** | 0 | |
| **Term** | Open | Price: DKK 586.3316 |
| **Cash Rebate Interest** | DKK LIBOR SPOT NEXT | |
| **Cash Rebate Spread** | 70 | Notional: DKK 351,798,960.00 |
| **Stock Rebate Interest** | DKK LIBOR SPOT NEXT | |
| **Stock Rebate Spread** | 19.75 | Trade Date: March, 26, 2013 |
| **Cash Pool Type** | fixed | |
| **Dividends** | 100% | Settlement Date: March 27, 2013 |
| **Counterparty** | DDC CAYMAN LIMITED | |

**Figure 14 – Stock Loan Confirmation from Solo Capital to Colbrook Limited[222]**

170.    The main terms of the loan agreement – the number of shares, price, trade date and

---

[220] ELYSIUM-01487958.
[221] ELYSIUM-01487961.
[222] ELYSIUM-01487958.

settlement date – were the exact same as the terms of the stock loan agreement between the Bernina Plan and Colbrook Limited.[223]

171.    The overall impact of this transaction, in aggregate, is that the Bernina Plan nearly simultaneously (1) purchased DKK 351,798,960 worth of Carlsberg stock from D.D.C. Cayman; and (2) loaned the same DKK 351,798,960 worth of Carlsberg shares back to D.D.C. Cayman in a closed loop circular fashion.  Neither entity ever held actual Carlsberg shares or went into the market to acquire any shares.



**Figure 15 – The Bernina Plan Solo Trade**

172.    Solo Capital later unwound the transaction by purportedly selling the Carlsberg shares it held and closing out the loan agreement.

173.    In the end, there was no movement of cash or delivery of securities.  The purported transactions were simply reversed, leaving only a paper trail to support the reclaim application.  I have seen no evidence that any of the parties to this transaction loop ever

---

[223] ELYSIUM-01487961.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 57

actually owned shares in—or ever received a dividend payment from—Carlsberg.[224]

e.    **The Bernina Plan subsequently submits a dividend WHT reclaim request to SKAT**

174.    Acupay System LLC ("Acupay"), which is a third-party service provider that facilitates the submission of dividend withholding tax reclaims, submitted the reclaim request to SKAT on behalf of the Bernina Plan.[225]



**Figure 16 – The Bernina Plan Solo Trade**

175.    The reclaim request package included a "Dividend Credit Advice" from Solo Capital representing that the Bernina Plan owned the 600,000 shares in Carlsberg described above and received a dividend on those shares net of withholding tax.

---

[224] I noted that 20 Plans purportedly traded, in aggregate, 12,920,000 shares of Carlsberg stock on March 21, 2013, representing a total market value of approximately DKK 7,576,233,766 (or USD $1.3 billion). I reviewed the Plans trading data for every purported transaction related to Carlsberg stock on March 21, 2013 and concluded that they all followed the same steps, and had the same circular trading pattern, as described in the sample Carlsberg transaction purportedly executed by the Bernina Plan.
[225] SKAT_MDL_001_00059511.



**Figure 17 – Dividend Credit Advice[226]**

### 3.    Sample "Complex loop" transaction purportedly executed by the Loggerhead Plan

176.    On March 19, 2015, the Loggerhead Plan purportedly purchased 6,847,676 shares of Novo Nordisk A/S – B ("Novo Nordisk") stock from a Solo-affiliated entity called Black Square Ltd.[227]  Upon review of the supporting documentation underlying this transaction and

---

[226] SKAT_MDL_001_00059511.
[227] Dilip Shah, who was employed by Solo Capital in 2011, controlled Black Square Ltd.  *See* CAYMAN_00002615.

a search of Solo Capital's records, there is no evidence that Black Square owned any shares in Novo Nordisk at the time of the sale. Thus, at the time of the sale, Black Square was a short-seller, and would have to acquire the shares to cover the short in time for delivery to the Loggerhead Plan on the settlement date. Black Square, however, did not obtain any shares from the market to cover the short. Rather, as demonstrated below, Black Square purportedly borrowed the shares from the Loggerhead Plan itself (through a three-step lending transaction). The Loggerhead Plan also did not have any Novo Nordisk shares to lend, making this a completely circular and fabricated securities transaction. Further, there is no evidence of actual shares of Novo Nordisk ever existing anywhere in this "complex loop" or entering in from some other external source.



**Figure 18 – Solo Trades for the Loggerhead Plan**

    a.    **Trade Approval 1: The Mako Financial Markets LLP purportedly purchased shares in Novo Nordisk from The Black Square Ltd in March 2015**

177.    On March 19, 2015, Mako Financial Markets LLP, acting as broker, purportedly purchased 6,847,676 shares of Novo Nordisk at a price of DKK 341.90 per share from Black

Square Ltd for a total USD equivalent of $333.8 million.[228]  As noted above, there is no evidence that Black Square Ltd. ever actually owned these shares of Novo Nordisk since the sub-custodians acting for Solo Capital, who were supposedly acting as the custodians for the shares, have either affirmatively stated in sworn affidavits that they never had any record of the shares existing in their custody systems and/or produced documents from their share custody systems to reflect that they did not hold any Danish securities for Solo Capital during this period.  Also as noted above, based on my thorough review of Solo Capital's business records, I have not seen any documentation reflecting the transfer of Novo Nordisk shares from the market into Black Square's account at Solo Capital.



**Figure 19 – Trade Confirmation from Solo Capital to Mako Financial Markets LLP[229]**

---

[228] ELYSIUM-03957835
[229] ELYSIUM-03957835.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 61

b.      **Trade Approval 2: The TJM Partnership PLC purportedly purchased shares in Novo Nordisk from Mako Financial Markets LLP in March 2015**

178.    Simultaneously on March 19, 2015 – and only <u>4 seconds</u> after the Black Square Ltd. transaction in the preceding step – The TJM Partnership PLC purportedly purchased the same number of shares in Novo Nordisk at the exact same price from Mako Financial Markets LLP.[230]  It is apparent from the timing and details of this trade and the prior trade that TJM Partnership purportedly purchased the Novo Nordisk securities from Black Square through the broker Mako Financial Markets LLP.



**Figure 20 – Trade Confirmation from Solo Capital to The TJM Partnership PLC[231]**

179.    Similar to FGC Securities LLC's role with the Bernina Plan, the use of the executing

---

[230] ELYSIUM-03957972.
[231] ELYSIUM-03957972.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 62

broker Mako Financial Markets LLP has no apparent business purpose other than to create an air of legitimacy to the trade.  In the Solo Trades, there was no need for an executing broker because the counterparties did not need to seek liquidity from the open market.  Solo Capital pre-selected the counterparties to each trade from among the counterparties that had "on-boarded" to the Solo Capital platform and determined the volume of each trade.  As a result, Mako Financial Markets LLP served no legitimate function.

     c.    **Trade Approval 3: The Loggerhead Plan purportedly purchased shares in Novo Nordisk from The TJM Partnership PLC in March 2015**

180.    Next, simultaneously on March 19, 2015 – and just 16 seconds after the Mako Financial Markets LLP transaction in the preceding step – the Loggerhead Plan purportedly purchased the same number of shares in Novo Nordisk at the exact same price from The TJM Partnership PLC.[232]

---

[232] ELYSIUM-03957912.



**Figure 21 – Trade Confirmation from Solo Capital to the Loggerhead Plan**[233]

181.    The trade confirmation sent by Solo Capital indicates that the settlement date for the transaction was three business days later (T+3) on March 24, 2015.[234]

182.    It is apparent from the timing and details of this series of trades through Mako Financial Markets LLP that, in effect, the Loggerhead Plan purportedly purchased the Novo Nordisk securities from Black Square Ltd.  It appears that the only purpose in executing the purported trades with The TJM Partnership PLC in the middle was to add an extra layer of complexity to the paper trail for the transactions.  Once again, there is no evidence that any of these counterparties ever actually owned or had possession of shares in Novo Nordisk stock through any custodian.

---

[233] ELYSIUM-03957912.



**Figure 22 – The Loggerhead Plan Solo Trade**

        **d.      Stock Loan 1: The Loggerhead Plan purportedly loaned the Novo Nordisk shares it purchased to Neoteric Limited in March 2015**

183.    The Loggerhead Plan purportedly entered into a securities lending agreement with Neoteric Limited,[235] under which the Loggerhead Plan agreed to loan the <u>same shares</u> in Novo Nordisk that it purchased from The TJM Partnership PLC.[236]  The loan transaction settled on March 24, 2015 which was the same settlement date as the purported purchase of the shares.

---

[235] Neoteric was one of eight stock loan counterparties for which Martin Smith was a shareholder and director. Smith was also employed by Novus Capital Markets, a purported broker for the Solo Trades.  See paragraph 109.
[236] ELYSIUM-03977485.

**To:** Trading@LoggerheadPension.com[Trading@LoggerheadPension.com]
**Cc:** martin.smith@neotericltd.com[martin.smith@neotericltd.com]; alex.smith@neotericltd.com[alex.smith@neotericltd.com]; solotradeapprovals@solo.com[solotradeapprovals@solo.com]
**From:** solotradeapprovals@solo.com[solotradeapprovals@solo.com]
**Sent:** Mon 23-03-2015 14:20:59 (UTC)
**Subject:** Account (LOG01) - trade approved

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| | | |
|---|---|---|
| **Client Account** | LOG01 | Client: The Loggerhead Plan |
| **Counterparty** | Neoteric Limited | Counterparty: Neoteric Limited |
| **Trade Type** | Lend | Trade Type: Stock Loan |
| **Ticker** | NOVOB | Ticker: NOVOB |
| **Product (Instrument)** | Stock Loan (Equity) | Instrument: Equity |
| **Currency** | DKK | |
| **Price** | 341.9000 | Quantity: 6,847,676 shares |
| **Quantity/Contracts** | 6,847,676 | |
| **Shapes** | **Shape 1** 6,847,676 | Price: DKK 341.9000 |
| **Notional** | 2,341,220,424.40 | Notional: DKK 2,341,220,424.40 |
| **Trade Date** | 23 March 2015 | |
| **Settlement Date** | 24 March 2015 | Trade Date: March 23, 2015 |
| **Haircut** | 0 | |
| **Term** | Open | Settlement Date: March 24, 2015 |
| **Interest Rate Type** | Fixed | |
| **Interest Rate** | 70.0000 | |
| **Lending Fee Rate** | 86.0000 | |
| **Cash Pool Type** | Fixed | |
| **Dividends** | 100% | |

**Figure 23 – Stock Loan Confirmation from Solo Capital to the Loggerhead Plan**[237]

184.    As part of the stock loan transaction, Neoteric Limited agreed to provide cash collateral to the Loggerhead Plan representing the full market value of the shares borrowed. However, the stock price that the loan agreement (and therefore the amount of collateral provided by Neoteric Limited) was premised on was the price that the Loggerhead Plan had purchased the shares from The TJM Partnership PLC on March 19, 2015 – rather than the market price as of the date of the stock loan on March 23, 2015.

---

[237] ELYSIUM-03977485.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 66

185.    As discussed above, the stock loan step in each of the Solo Trades takes place at the same price the security was purchased at (several days earlier), rather than at the market price as of the date of the stock loan. This does not comport with how securities lending works in the real world.

186.    In fact, the closing stock price of Novo Nordisk on March 23, 2015 declined by DKK 2.80 per share since the purported stock purchase on March 19, 2015.[238]  As a result, the total market value of the 6,847,676 shares that the Loggerhead Plan purportedly loaned to Neoteric Limited would have declined by DKK 19.2 million (or approximately USD $2.8 million). Given that the collateral purportedly provided by Neoteric Limited was based on the stock price as of March 19 rather than March 23, the drop in the stock price between the two dates resulted in Neoteric Limited purportedly providing the Loggerhead Plan with approximately DKK 19.2 million in excess collateral.



**Figure 24 – The Loggerhead Plan Solo Trade**

187.    I have reviewed the Solo Capital account statement for the Loggerhead Plan, which

---

[238] http://www.nasdaqomxnordic.com/shares/historicalprices (last visited December 23, 2021).

shows that the Loggerhead Plan deposited no funds into its Solo Capital trading account prior to its purported purchase of the Novo Nordisk securities, and had a zero cash balance at the time of the purchase.  The purpose of the stock loan was to ostensibly show that the Loggerhead Plan, a newly formed entity, had sufficient liquidity, via the cash collateral it purportedly received from Neoteric Limited, to fund the purchase of DKK 2,341,220,424.40 worth of Novo Nordisk stock at settlement on March 24, 2015, since it had virtually no assets prior to this to accomplish the purchase of the shares.[239]

> e.    **Stock Loan 2: Neoteric Limited purportedly loaned the Novo Nordisk shares it borrowed to Relative Value Trading GmbH**

188.    Neoteric Limited then loaned its shares in Novo Nordisk, the same shares that it had just borrowed from the Loggerhead Plan, to Relative Value Trading GmbH.[240]  The trade approval email for this transaction was sent just 7 minutes after the stock loan transaction it purportedly entered into with the Loggerhead Plan.[241]

---

[239] As of March 24, 2015, the Loggerhead Plan had a bank account balance of only $16 in its Wells Fargo account, *see* LH00000001 at 92.  Additionally, the 2015 financial statements for Loggerhead reports a beginning cash balance of $71,459, an ending cash balance of $115,682 and total trading income for the year of $2.4 million, *see* WH_MDL_00108530.  Therefore, without the collateral proceeds from the purported stock loan, the Loggerhead Plan lacked the liquidity necessary to purportedly purchase **$333.8 million** worth of Novo Nordisk stock.  It is important to note that I have seen no evidence of the existence of the actual cash collateral of approximately $334 million.
[240] Relative Value Trading was controlled by Alex Koerner, who also controlled four other stock loan counterparties. See paragraph 109.
[241] ELYSIUM-03978529.