# Exhibit 13

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 19MT

May 23, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

|     |                                                                 |
|-----|-----------------------------------------------------------------|
| 1   | recall that they had their own personal pension plans           |
| 2   | that had been in existence for years. It could be the           |
| 3   | case that they didn't use those for this trading.               |
| 4   | Q. They may well have had, but they didn't use it for this      |
| 5   | trading, as you say. Many of the Argre plans, the               |
| 6   | original Argre plans, had no money in their Solo                |
| 7   | accounts when they began GSS trading; do you recall             |
| 8   | that?                                                           |
| 9   | A. Yes, I would agree with that.                                |
| 10  | Q. Yes. And the fact that they didn't have any money in         |
| 11  | their Solo cash accounts when they started trading              |
| 12  | wasn't a problem because of course the GSS Model didn't         |
| 13  | require the US pension plans to have any cash at all in         |
| 14  | order for them to trade, correct?                               |
| 15  | A. Yes, that's correct.                                         |
| 16  | Q. Can I just ask you this: by 2012, you had been engaged       |
| 17  | in cum-ex trading with Argre for a number of years              |
| 18  | including in relation to the Broadgate transaction,             |
| 19  | correct?                                                        |
| 20  | A. Yes, correct.                                                |
| 21  | Q. And you had obviously built a relationship of trust with     |
| 22  | them, correct?                                                  |
| 23  | A. Yes, correct.                                                |
| 24  | Q. And they had invested substantial capital in both the        |
| 25  | Broadgate and Ezra transactions as well, correct?               |

13

| 1   | A. Yes. So I did mention that I don't recollect at the          |
|-----|-----------------------------------------------------------------|
| 2   | time —— sorry, I don't recollect the Ezra trade, but            |
| 3   | I was reminded about that a couple of days ago. So yes,         |
| 4   | I agree with you.                                               |
| 5   | Q. Would you have explained to Argre, and I suggest you         |
| 6   | must have, that under the GSS Trading Model it would not        |
| 7   | be necessary for them to invest capital?                        |
| 8   | A. Yes, and specifically the explanation would have been        |
| 9   | that they would have been able to —— that the pension           |
| 10  | plans would have lent their shares out in order to raise        |
| 11  | the cash needed to pay for the shares, so that was the          |
| 12  | reason for no requirement for external money.                   |
| 13  | Q. And they would also have understood that no external         |
| 14  | leverage and financing would be required because the GSS        |
| 15  | Trading Model didn't involve any external movements of          |
| 16  | shares as the trade would all be internally settled to          |
| 17  | zero within Solo, correct?                                      |
| 18  | A. I don't recall explaining that to them, no. I explained      |
| 19  | to them the activities of the pension plan from the             |
| 20  | pension plan's perspective.                                     |
| 21  | Q. But they must have been interested to understand how it      |
| 22  | was that no external leverage or financing would be             |
| 23  | required?                                                       |
| 24  | A. I don't remember any specific conversation about that.       |
| 25  | I explained or we explained the fact pattern to them            |

14

| 1   | from the perspective of the pension plan and they seemed        |
|-----|-----------------------------------------------------------------|
| 2   | to be satisfied with that. They were aware that Solo            |
| 3   | was acting as a custodian and clearer and therefore             |
| 4   | naturally Solo would be responsible for settlements.            |
| 5   | Q. Mr Shah, I'm trying, I really am, I'm not just being         |
| 6   | difficult about this —— why would they have been willing        |
| 7   | to participate in a scheme where they couldn't possibly         |
| 8   | have understood why it was that they didn't need to             |
| 9   | obtain any funding unless you explained to them that            |
| 10  | effectively there was going to be a loop which meant            |
| 11  | that ultimately everything would be zero settled?               |
| 12  | A. No, I didn't explain to them the loop. The loop is           |
| 13  | quite a recent concept for me and it was necessary for          |
| 14  | them to understand that they were lending the shares out        |
| 15  | in order to raise cash to purchase the shares. I think          |
| 16  | that is all they needed to know. They seemed to be              |
| 17  | happy with that. I don't have any recollection of any           |
| 18  | hesitancy on their side. As well as that, they were             |
| 19  | also quite resourceful in terms of getting their own            |
| 20  | advice and they were —— if needed, they were able to            |
| 21  | fund these accounts. But we told them that on this              |
| 22  | occasion they didn't need to do that.                           |
| 23  | Q. So what it seems you are saying, Mr Shah, is that you        |
| 24  | withheld even from your trusted investor the fact that          |
| 25  | the GSS Trading Model did not involve any external              |

15

| 1   | movement of shares?                                             |
|-----|-----------------------------------------------------------------|
| 2   | A. Solo was talking —— I was talking and Solo was talking       |
| 3   | to Argre in the context of providing services to                |
| 4   | a client. Our conversation was limited to providing             |
| 5   | those services. The activities beyond their involvement         |
| 6   | was not of their concern and it was in fact                     |
| 7   | confidential. So it is not normal for a prime broker or         |
| 8   | a custodian to discuss the business of other clients            |
| 9   | with each other.                                                |
| 10  | Q. Mr Shah, these people, you told me, were people you          |
| 11  | trusted. You had done other transactions with them.             |
| 12  | But you were still not willing to tell them the truth           |
| 13  | about exactly what it is your scheme involved, correct?         |
| 14  | A. No, that's not correct. No, that's not correct.              |
| 15  | Q. You didn't tell them the truth about what your scheme        |
| 16  | involved. You withheld key aspects of that scheme from          |
| 17  | them?                                                           |
| 18  | A. No, that is not correct. We gave them the information        |
| 19  | that they needed and they decided to participate.               |
| 20  | Q. So you gave them half the story because you were not         |
| 21  | willing to give them the whole story?                           |
| 22  | A. I wouldn't say half the story. I would say even less         |
| 23  | than that, probably an eighth of the story, yes.                |
| 24  | Q. Right. Well, I'm happy to go with that. Can I move on        |
| 25  | to the Zeta plans, then, Mr Shah and for this purpose           |

16

Opus 2
Official Court Reporters

transcripts@opus2.com
020 3008 6619

Confidential

SKAT_MDL_001_00838250