# Exhibit 102

1              UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
2          MASTER DOCKET 18-MD-2865(LAK)
              CASE NO. 18-CV-09797
3

4   _____
                                            )
    IN RE:                                  )
5                                           )
    CUSTOMS AND TAX ADMINISTRATION OF       )
6   THE KINGDOM OF DENMARK                  )
    (SKATTEFORVALTNINGEN) TAX REFUND        )
7   SCHEME LITIGATION                       )
                                            )
8   _____)

9

10

11

12            C O N F I D E N T I A L

13

14

15   REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

16                 EXAMINATION OF

17               MICHAEL BEN-JACOB

18            DATE: October 11, 2021

19

20

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR

CONFIDENTIAL
Michael Ben-Jacob — October 11, 2021

Page 23

```
1    representation of any of your former clients

2    where you said, "No, you should not do this?"

3              MR. DEWEY:  Objection.

4         A    With respect to the U.S. advice

5    that we were asked to render, I believe that

6    there were strategies or thoughts as to how

7    the ownership should be held or how payments

8    should be made among the clients or their

9    entities or their pension plans where the

10   appropriate lawyers with that substantive

11   area of expertise, typically on the pension

12   side, advised the clients that they should

13   not do whatever was at issue.

14        Q    Did you ever provide any assurance

15   to any of your former clients that it was

16   appropriate for a plan to represent to

17   Denmark that the plan was the beneficial

18   owner of Danish shares or Danish dividends?

19             MR. DEWEY:  Objection.

20        A    Can you please explain your

21   question?

22        Q    You understood that the plans that

23   were set up in this ex-dividend strategy were

24   going to be making reclaim applications to

25   Denmark.
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 24

```
1              Correct?

2       A    Yes, I understood that.

3       Q    Did you ever provide any assurance

4    to any of your former clients that those

5    plans could appropriately represent that they

6    were the beneficial owners of Danish shares

7    or Danish dividends?

8              MR. DEWEY:  Objection.

9       A    My firm advised that for U.S. tax

10   and pension law purposes, the pension plans

11   that engaged in the trading were -- could

12   appropriately represent that they were the

13   owners of the shares, again, from a U.S. tax

14   and pension law perspective.

15      Q    That the plans could appropriately

16   represent, for U.S. tax purposes, that they

17   were the beneficial owners of the shares.

18              Is that correct?

19      A    That's correct.

20      Q    And to whom were the plans

21   representing, for U.S. tax purposes, that

22   they were the beneficial owners of the

23   shares?

24      A    Well, for example, to the IRS and

25   to -- from a regulatory perspective, to the
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 26

1        Q    Outside of U.S. tax and U.S. -- you
2    said "regulatory."
3              Is that U.S. regulatory?
4        A    Yes, U.S. regulatory.
5        Q    Did you provide any advice with
6    respect to any of the ex-dividend strategy
7    outside of the area of U.S. tax and U.S.
8    regulatory?
9              MR. DEWEY:  Objection.  You,
10         Mr. Ben-Jacob, or his firm?
11        Q    You or your firm?
12        A    Well, to the best of my
13    recollection, there may be something that I'm
14    missing.  But I do recall that there were
15    some German law advice that my firm's German
16    office provided.
17        Q    Anything else?
18        A    I -- I don't recall anything else.
19        Q    Do you believe that in connection
20    with the ex-dividend strategy which you
21    assisted your clients, do you believe that
22    they told you everything that you needed to
23    know about those transactions?
24              MR. DEWEY:  Objection.
25        A    This group of clients is a very

```
 1    sophisticated group of clients --
 2    accountants, lawyers, MBAs -- that I had a
 3    longstanding relationship with.  I
 4    represented any number of them, you know,
 5    five or six or seven years by the time this
 6    transaction took place.
 7            And I believed then, and I believe
 8    now that they told us all the relevant facts
 9    and information related to the trading.  And
10    I relied on them on the basis of that
11    relationship, and their honesty and
12    integrity, as evidenced through the five
13    years or six years that I represented them,
14    and their expertise -- their own expertise in
15    U.S. tax and related matters.
16       Q    So do you believe they told you
17    everything that you needed to know about the
18    transactions on which you were engaged to
19    assist?
20            MR. DEWEY:  Objection.
21       A    We relied on them for the
22    information surrounding the transactions, and
23    I believe they told us everything that we
24    needed to know.
25       Q    Do you believe they withheld any
```

1    information from you that you needed to know?

2              MR. DEWEY:  Objection.

3         A    I have no reason to think that they

4    withheld any information.

5         Q    When they asked you to assist them

6    with the transaction, did they explain to you

7    each step of the proposed transaction?

8              MR. DEWEY:  Objection.  In Denmark?

9         Bill, can we be a little bit more

10        specific?

11        Q    As a general matter -- if there are

12   some exceptions, please let me know.

13             But as a general matter, this

14   sophisticated group of clients, when they

15   engaged you to assist with the transaction,

16   did they explain to you specifically and in

17   detail each step of the transaction?

18             MR. DEWEY:  Objection.

19        A    I recall conversations with some of

20   the group of clients where they explained to

21   me at a high level the general concepts

22   underpinning the transaction.

23        Q    Was there ever any occasion where

24   you felt that your clients had failed to tell

25   you any significant step or any insignificant

1    Exhibit 4484?

2              MR. MAGUIRE:  Mark 4484.

3              (Whereupon the above mentioned was

4         marked for Identification.)

5         Q    Let me know when you've had a

6    chance to review the document.

7         A    (Witness reviewing.)

8              I've read the document.

9         Q    Is that your signature on the third

10   page?

11        A    That is my signature, yes.  It's

12   the second page.

13             Is there a third page?

14        Q    I'm sorry.  Second page.  You're

15   right.

16        A    Okay.  Yes, that is my signature.

17        Q    Did you assist in transactions

18   involving Ezra Academy?

19             MR. DEWEY:  Objection.

20        A    My firm provided advice with

21   related transactions involving our clients,

22   or what you're calling former clients, in

23   Ezra Academy.

24        Q    And were you involved in providing

25   those services?

CONFIDENTIAL
Michael Ben-Jacob – October 11, 2021

```
 1        A    I don't have a recollection of this
 2   e-mail, so I can't say what I understood at
 3   the time.
 4        Q    Well, separately from this e-mail,
 5   did you have an understanding that in 2014,
 6   your former clients wanted to set up plans to
 7   participate in Danish trading?
 8             MR. DEWEY:  Objection.
 9        A    (Witness reviewing.)
10             That was my general understanding.
11        Q    And did you understand that
12   Sanjay Shah and Solo had allocated a certain
13   number of plans to your former client group?
14             MR. DEWEY:  Objection.  In Denmark,
15        Bill?
16             Where are we?
17             MR. MAGUIRE:  Yes.
18        A    I was not familiar with the
19   business arrangements between Sanjay Shah and
20   the former clients except at a very high
21   level.  So I'm not familiar with the point
22   that you've raised.
23        Q    Did your former clients ever
24   indicate to you that the reason they wanted
25   to set up plans was because they wanted to
```

```
1      use their allocation from Solo and

2      Sanjay Shah?

3                  MR. DEWEY:  Objection.

4          A    The business arrangements between

5      my former clients and Sanjay Shah were

6      negotiated directly between them, among them.

7      I nor -- to the best of my knowledge, nor my

8      firm was involved in those discussions.

9          Q    Did you ever ask your former

10     clients what were the business arrangements

11     between them and Solo Capital?

12         A    To the best of my recollection, the

13     only aspect that I can recall of those

14     business arrangements -- of those business

15     arrangements had to do with a general

16     allocation of the dividend reclaims as a

17     matter of percentages between the former

18     clients and Sanjay's group.

19         Q    That was the general allocation of

20     what, 66 percent to 34 percent?

21         A    It was -- I don't recall

22     specifically, but it was something like that.

23                 MR. MAGUIRE:  Tom, I think you

24          wanted to take a break at this stage?

25          So we don't we take -- how long do you
```

1    is what you're asking.

2        Q    You're saying you did not have that

3    understanding?

4        A    I would not have had that

5    understanding, correct.

6        Q    Can you turn, sir, to Exhibit 4494?

7            MR. MAGUIRE:  Mark 4494.

8            (Whereupon the above mentioned was

9        marked for Identification.)

10       A    Yeah, I have it here.  Again bear

11   with me as I look through it.

12           (Witness reviewing.)

13       Q    My only question, sir, about this

14   e-mail is whether this is one on which you

15   were copied from Adam LaRosa on or about

16   May 11, 2013?

17       A    (Witness reviewing.)

18           The top e-mail in the exchange is

19   dated May 11, 2013.  It's from Adam LaRosa,

20   and in the CC, I confirm, it lists my e-mail

21   address.

22       Q    Now, you were involved in questions

23   that arose concerning FBAR reporting by your

24   former clients.

25           Correct?

```
 1              MR. DEWEY:  Objection.
 2         A    Just to be clear, are you asking me
 3    that in relation to this document, or
 4    generally?
 5         Q    Generally?
 6         A    Generally, yes, that's correct.
 7         Q    And in connection with that, your
 8    former clients sent financial information to
 9    you and your firm?
10              MR. DEWEY:  Objection.
11         A    I believe that's correct.
12         Q    Attached to this e-mail is an
13    account for Mill River Capital Pension Plan.
14              Do you see that?
15         A    I do.
16         Q    And if you look at the first page,
17    you'll see this is an account from
18    Solo Capital?
19         A    (Witness reviewing.)
20              The Solo Capital's logo appears at
21    the top right of the page, yes.
22         Q    And you'll see, in the middle of
23    the page, there's an "Account Financial
24    Summary?"
25         A    Well, are you talking about the box
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 66

```
1     right under the address?
2            MR. DEWEY:  Want me to direct him,
3        Bill?
4        Q    Right under the address, there's a
5     box of --
6        A    Oh, there it is.  Sorry.  Yes, I
7     see the words "Account Financial Summary."
8        Q    Yeah.  And then, just below that,
9     on the left-hand side, you'll see "Open Cash
10    Balance."
11           Do you see that?
12       A    Yes.
13       Q    And it shows a zero open cash
14    balance in Euro kroner and Euro base?
15       A    I see that, yes.
16       Q    Just below that, you see the cash
17    equity settlement.
18           Do you see that?
19       A    I do.
20       Q    And that provides a purchase price
21    that's just over 849 million kroner?
22       A    I don't know what the words "cash
23    equity settlement" mean, so I can't speak to
24    whether that figure speaks to a purchase
25    price or something else.
```

```
 1       Q    You have no understanding as to
 2   whether that amount is the purchase price of
 3   Danish equities.
 4            Is that correct?
 5       A    I don't know what the words "cash
 6   equity settlement" mean.  I know what the
 7   words "purchase price" means.
 8            I don't know what the words "cash
 9   equity settlement" means.
10       Q    If you look further down, about
11   five or six lines below the cash equity
12   settlement words, you'll see the words "stock
13   loan cash original."
14            Do you see that?
15       A    I do.
16       Q    And you understood that the plans
17   would be financing their purchases of equity
18   by entering into stock lending agreements.
19            Is that correct?
20            MR. DEWEY:  Objection.
21       A    I understood that the plans were
22   entering into stock lending agreements.  I
23   did not understand the function of those
24   lending agreements in the overall
25   transaction.
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 68

```
1        Q    You'll see that the amount of the
2    stock loan cash original here is the exact
3    same amount as the cash equity settlement.
4            Do you see that?
5        A    Well, one is a negative number.
6    The other is a positive number.
7        Q    And the actual numbers themselves
8    are identical?
9        A    Yes, I do see that.
10       Q    So did you understand that the
11   plans were paying for Danish shares with cash
12   they obtained from a stock lending agreement
13   to cover the full amount of the stock
14   purchase?
15           MR. DEWEY:  Objection, asked and
16       answered.
17       A    I understood generally that there
18   were financing purchases.  I did not have an
19   understanding at the time, or now, as to how
20   that how those financing arrangements were
21   made.
22       Q    Did you understand that the plans
23   were beginning their trading with zero cash
24   balances?
25       A    I don't recall one way or the
```

CONFIDENTIAL
Michael Ben-Jacob — October 11, 2021

1    other.

2        Q    Now, you'll see at the bottom of

3    the page or close to the bottom of the page,

4    there's a reference to "cash movements?"

5        A    Yes, I see that.

6        Q    And you'll see that's zero?

7        A    Yes, it says zero.

8        Q    If you turn to the last page of the

9    document, sir -- or actually, let me back up.

10   Before we go to the last page, we can also

11   look at the page ending in the Bates 594.

12       A    I think I have the right page.

13       Q    Do you see in the center, at the

14   top, it says "Stock Loan Transaction

15   Statement?"

16       A    Yes.

17       Q    And right below those words is the

18   word "counterparty," and the counterparty in

19   every case is Aquila (Cayman)?

20       A    I may be on the wrong page.  I

21   don't see the words "counterparty."

22           THE WITNESS:  Do you see it?

23           MR. DEWEY:  Do you want me to

24       direct him, Bill?

25       A    Wait.  I'm sorry.  Here.  It's in

CONFIDENTIAL
Michael Ben-Jacob — October 11, 2021

```
 1    the columns right here.
 2              I have it here, yes.
 3    "Counterparty," yes.
 4         Q    Do you see Aquila (Cayman) is the
 5    stock loan counterparty?
 6         A    I do.
 7         Q    What did you know about
 8    Aquila (Cayman)?
 9         A    I had a general recollection that
10    that was an entity somehow associated with
11    Solo Capital.
12         Q    And what was the -- where did you
13    get the understanding?
14         A    It's just a vague recollection that
15    I have.  I can't recall specifically.
16         Q    You don't recall who told you what
17    the relationship was with Solo Capital?
18         A    I do not.
19         Q    And do you understand what was the
20    relationship?  How were Solo and
21    Aquila (Cayman) related?
22         A    I do not recall.
23         Q    Did Sanjay Shah control Aquila
24    capital?
25              MR. DEWEY:  Objection.
```

```
 1        A    I do not recall one way or the

 2    other.

 3        Q    If you could turn to the last page

 4    of the document?

 5        A    I have it.

 6        Q    There's a table at the bottom?

 7        A    Yeah.  I can't see it, but yes.

 8        Q    It's hard to read.  Only thing I

 9    want you to focus on is the last line.

10            Do you see where it says "variation

11    margin?"

12        A    Yes, I see those words.

13        Q    What is "variation margin?"

14        A    I do not know.

15        Q    Can you turn, sir, to Exhibit 4495?

16            MR. MAGUIRE:  Mark 4495.

17            (Whereupon the above mentioned was

18        marked for Identification.)

19        A    Okay.  I have it here.

20        Q    Is this an e-mail that Adam LaRosa

21    sent to you on or about June 4 of 2013?

22        A    So bear with me as I go through the

23    whole exhibit.

24            (Witness reviewing.)

25            I skimmed through this.  What is
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 72

1    your question?

2        Q    So you received this from Adam

3    LaRosa on or around June 4 of 2013?

4        A    Well, I don't have any specific

5    recollection of this e-mail exchange, but the

6    e-mail indicates it was sent to me on that

7    date.

8        Q    And Mr. LaRosa says he's sending

9    you "the actual cash balances for 2012."

10            Do you see that?

11       A    I do.

12       Q    So if we go to the first one of

13   this page, you'll see it's an e-mail, again

14   from Custody@Solo to Adam@Mill River Capital.

15            Do you see that?

16       A    I do.

17       Q    And it gives the Mill River cash

18   balances for 2012.

19            Do you see that?

20       A    I do.

21       Q    And you'll see that the balances

22   are all negative, except for two, which is

23   the refund from Denmark.

24            Do you see that?

25       A    I do.

```
 1        Q    Now if you turn to the next page,
 2   you'll see a similar balance from Solo for
 3   Lion Advisory.
 4             Right?
 5        A    (Witness reviewing.)
 6             Well, I see an e-mail from
 7   Custody@Solo, May 23, 2013 at 1039.  I'm not
 8   sure -- oh, Lion Advisory, there it is.
 9             Yes, that's Adam LaRosa's e-mail
10   address, yes.
11        Q    And again, you'll see that each of
12   the balances here is negative except for the
13   refund money from Denmark.
14             Correct?
15             MR. DEWEY:  Objection.
16        A    That's what it seems to say, yes.
17        Q    If we turn to the next page, we'll
18   see the balance from Solo for California
19   Catalogue Company.
20             Do you see that?
21        A    Yes.
22        Q    And again, you'll see all of the
23   cash items are negative except for the refund
24   from Denmark?
25             MR. DEWEY:  Objection.
```

```
1        A    Yes, I see that.

2        Q    And if we turn to the next page,

3   you'll see the cash statement from Solo for

4   the Delvian plan.

5             Right?

6        A    Yes.

7        Q    And all the cash balances again are

8   negative except for the refund money from

9   Denmark.

10            Right?

11            MR. DEWEY:  Objection.

12       A    Yes, I see that.

13       Q    Did you ever see any positive cash

14   balance for any plan other than the

15   withholding tax refund from Denmark?

16            MR. DEWEY:  Objection.

17       A    (Witness reviewing.)

18            I don't recall one way or the

19   other.

20       Q    Sir, if you could turn to Exhibit

21   4496?

22            MR. MAGUIRE:  Mark 4496.

23            (Whereupon the above mentioned was

24       marked for Identification.)

25       A    I have it here.
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

```
 1              This was a financial statement

 2     prepared by what appears to be Ron Carlin, an

 3     accounting firm.  And I can't speak to why he

 4     used any particular term of art.

 5          Q    Mr. Carlin was working for Mr. Van

 6     Merkensteijn.

 7              Right?

 8          A    To the best of my understanding,

 9     yes.

10          Q    And Mr. Van Merkensteijn, you knew,

11     had directed that the books refer to reclaims

12     income as "trading income."

13              Right?

14              MR. DEWEY:  Objection.

15          A    I'm sorry.  Are you saying that's

16     in the e-mail exchange somewhere?  Did I miss

17     that?  Are you -- you're saying.

18          Q    Do you understand that?

19              MR. DEWEY:  Objection.

20          A    Again, I don't have a recollection

21     and I can't say one way or the other.

22          Q    You understood that Solo had a

23     services fee?

24          A    I generally understood Solo as

25     being paid a fee, a services fee, yes.
```

```
 1         Q     That was around 60 or 66 percent of

 2    the reclaim?

 3         A     That's my general recollection.

 4         Q     And here, the trading services fee

 5    is about 60 percent of the trading income?

 6         A     On approximate, looking at the

 7    numbers, it looks to be about that.

 8         Q     Do you understand that Mr. Van

 9    Merkensteijn had directed Mr. Carlin to style

10    the Solo reclaims fee as a trading services

11    fee?

12              MR. DEWEY:  Objection, asked and

13         answered.

14         A     I can't say what conversations were

15    had between Mr. Van Merkensteijn and

16    Mr. Carlin.  You'd have to ask them.

17         Q     Did you understand from the e-mail

18    communications that you had seen between

19    Mr. Van Merkensteijn and his colleagues that

20    he had asked them specifically to change the

21    descriptions in the accounts and the books of

22    the Azalea plan called "reclaim services fee"

23    a "trading services fee?"

24              MR. DEWEY:  Objection.

25         A     I'm sorry.  You had you said that's
```

```
 1      A    I don't recall conversations

 2  surrounding this exchange one way or the

 3  other.

 4      Q    Sir, if you could turn to Exhibit

 5  4498?

 6           MR. MAGUIRE:  Mark 4498.

 7           (Whereupon the above mentioned was

 8      marked for Identification.)

 9      A    Yes, I have it.

10      Q    Is this an e-mail you received from

11  Matthew Stein on or about October 12, 2012?

12      A    (Witness reviewing.)

13           That is the heading of the e-mail,

14  yes.

15      Q    In it, Mr. Stein says, "Michael,

16  please forward to Woody."

17           Do you have an understanding as to

18  who "Woody" was?

19      A    Yes.  That's a nickname used for

20  Arthur Woodard, one of the pension law

21  partners at Kaye Scholer at the time.

22      Q    And attached to the e-mail is a tax

23  reclaim advisory services agreement.

24           Do you see that?

25      A    (Witness reviewing.)
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 86

```
 1              Yes, I see that.

 2     Q     If you turn to Page 219500?

 3     A     I have that page here.

 4     Q     And you'll see a schedule?

 5     A     I do see a schedule.

 6     Q     And it gives a percentage split on

 7  a refund amount and the percentage of

 8  67.5 percent?

 9     A     That's what the document says, yes.

10     Q     Do you understand that was the

11  percentage of the reclaim that would be paid

12  to Ganymede?

13            MR. DEWEY:  Objection.

14     A     Well, it's titled "Relevant

15  Percentage" which appears to be a defined

16  term in the document, and the document speaks

17  for itself as to what it means.

18     Q     Do you understand that was the

19  amount that the plan would pay to Ganymede?

20     A     Again, I don't have a specific

21  recollection of this document, so I cannot

22  say one way or the other what my thinking was

23  at the time other than to say that the

24  document speaks for itself as to what the

25  definition of "relevant percentage" is.
```

1        Q    And is it your -- and is it your

2    understanding today that under the plan's

3    agreements with Ganymede, that pursuant to

4    this agreement, the plan would pay

5    67.5 percent to Ganymede?

6            MR. DEWEY:  Objection, vague.

7        A    I can't say today what this

8    agreement entails.  I would have to read it

9    and fully absorb it and I probably wouldn't

10   understand any of it in any event.

11           It's not in my area, as I mentioned

12   before.

13       Q    Did you read the tax reclaim

14   advisory services agreement at the time?

15       A    I don't recall one way or the

16   other.

17       Q    Was it your understanding that all

18   of the plans entered into a tax reclaim

19   advisory services agreement with Ganymede?

20       A    I don't recall.  I don't recall one

21   way or the other.

22       Q    Who is Ganymede?

23       A    Again, I have a vague recollection

24   that is an entity that had some association

25   with Solo Capital and Sanjay Shah.

```
 1        A     I don't recall.

 2        Q     Did Ganymede provide the services

 3   for any plans?

 4        A     So you just dropped out.

 5              Can you repeat the question,

 6   please?

 7        Q     Did Ganymede provide any services

 8   to the plans?

 9        A     I don't recall one way or the

10   other.

11        Q     You'll see the "services" is

12   defined as "tax reclaim advisory services?"

13        A     I see those words on the page, yes.

14        Q     What are they?

15              MR. DEWEY:  Objection.

16        A     I don't know.

17        Q     What services did Solo provide to

18   the plans?

19        A     I have a general understanding that

20   Solo advised as to the selection of

21   securities to purchase, generally assisted or

22   facilitated in obtaining financing, and

23   executed the trades.

24        Q     And how did the plans pay Solo for

25   those services?
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

1      A    My general understanding was that

2    there was a division of the profits from the

3    trades, approximately two-thirds, one-third.

4      Q    Two-thirds to Solo and one-third?

5      A    To the plan, correct.

6      Q    And did the plans then pay that

7    two-thirds to Solo or did they pay that

8    two-thirds to Ganymede?

9           MR. DEWEY:  Objection.

10     A    I don't know.

11     Q    Did you ever discuss -- did anyone

12   ever inform you that the payments for Solo's

13   services would be made to Ganymede?

14     A    Again, our firm and my own

15   involvement was limited to the U.S. tax and

16   pension law issues that the clients asked us

17   to look into, and again, regulatory and some

18   administrative matters, as I had mentioned

19   before.

20          We were not involved with the

21   negotiations with Solo.  We were not involved

22   in the flow of funds.  We were not involved

23   in the trading.

24          So I have no information with

25   respect to the questions you're asking.

1    okay?

2         A    Sure --

3              MR. DEWEY:  Or you can just say

4         "you" when you mean Mr. Ben-Jacob or the

5         firm.

6         A     In this matter, actually, as is

7    most of the matters we're discussing, it was

8    other attorneys in my firm that did the

9    lion's share of the work and I've helped

10   coordinate.  And that is true of this

11   particular memo as well.

12        Q    If we turn to the second page,

13   there's a Section B called "Trading and

14   Related Operations."

15             Do you see that?

16        A    Yes.

17        Q    That carries over to the top of the

18   next page where the first full sentence says,

19   "We understand that," and there's a couple of

20   little Roman Numerals there.

21             When you say, "we understand that,"

22   what was the basis for that understanding?

23        A    Representations made to us, meaning

24   to the firm, by the client or the client

25   group.

```
 1        Q    But was there any other basis for
 2   that statement?
 3        A    (Witness reviewing.)
 4             Are you talking about the first
 5   numerette, or the second numerette, or both?
 6        Q    Both.  Because I think we
 7   understand it has two numerettes there, so.
 8        A    So we understand that, one, Solo
 9   provided the entire structure of the trading
10   strategy to the trustees.  So I believe that
11   was entirely from the clients.  Number two,
12   the trustees had -- I'm sorry.
13             Number two, the trustees had little
14   or no ability to negotiate the financial
15   terms of the arrangement, which were
16   basically the same or more favorable to the
17   Michelle plan as arrangements that existed
18   between Solo or other providers which engaged
19   in this trading strategy.
20             I vaguely recall that there were
21   other providers.  A name that occurs to me is
22   Duet, if I have it right.  I'm not getting
23   the full correct name, but Duet.
24             And there were discussions with
25   Duet as to them providing similar services
```

1    that Solo provided and their fees were equal

2    to or more than Solo's.  So we did have some

3    independent information about what other

4    service providers were charging for similar

5    services.

6         Q    Anyone other than Duet?

7         A    I can't recall one way or the

8    other.

9         Q    You don't recall any other provider

10    other than Duet?

11         A    Not that I can recall.

12         Q    Do you recall what the fees were

13    that -- the fee arrangements that Duet

14    required?

15         A    Yeah, I can't say for sure.  My

16    recollection is very vague, but I seem to

17    think it was, on an order of magnitude, 70 or

18    75 percent of the profits from the

19    transactions.

20         Q    Then, with respect to the first

21    Roman numerette where Solo provided the

22    entire structure of the trading transaction,

23    what did that mean?

24             MR. DEWEY:  Objection.

25         A    I can't say specifically what the

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

1    phrase "entire structure" refers to here.

2         Q     Did you understand that Solo

3    recommended each step in the transactions?

4         A     That was my -- when you say "each

5    step," can you elaborate a little bit more

6    what you mean?

7         Q     Solo recommended all the purchases?

8         A     My understanding was that Solo

9    provided a list of, you know, suggested

10   purchases, and that the clients -- or I

11   should say the pensions then selected which

12   they wanted to pursue.

13        Q     And solo recommended all of the

14   stock loans?

15        A     Again, it was my general

16   understanding that Solo facilitated and made

17   introductions to financial and other lending

18   institutions.

19        Q     Solo recommended all the hedge

20   transactions?

21             MR. DEWEY:  Objection.

22        A     That, I don't recall one way or the

23   other.

24        Q     Solo recommended the specific

25   Danish security that the plans would buy?

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

```
 1                    MR. DEWEY:  Objection.
 2         A    I don't know one way or the other.
 3         Q    Did you ever do any diligence on
 4    Solo Capital?
 5         A    Can you elaborate by what you mean
 6    by "diligence?"
 7         Q    Any due diligence?
 8         A    Well, "due diligence" is a pretty
 9    vague term in my practice.
10              Can you tell me a bit more by --
11    what you mean?
12         Q    Any investigation, research of any
13    kind, to see whether -- what Solo was, what
14    it was capable of doing, what its financial
15    strength was, what its credit ratings were,
16    what its financial statement said?
17              Anything that -- along those lines?
18         A    So I do generally recall having
19    conversations along those lines with the
20    clients.  And they -- again, as we've
21    mentioned before, sophisticated business
22    people, accountants and lawyers indicated
23    they were doing their own due diligence.
24              I understood that they went to
25    London, met with Solo representatives.  I
```

```
 1     don't know with whom they met.  Stayed there
 2     for a number of days.
 3             I understood -- I have a vague
 4     recollection that they had some sort of
 5     report commissioned.  I can't remember the
 6     nature of the report, but some kind of --
 7     maybe it was a -- some business report or a
 8     certain business investigator.
 9             I can't remember the details, but
10     they had a third party investigate the bona
11     fides of Solo and Mr. Shah.  And so we relied
12     on our clients investigation and due
13     diligence.
14     Q     So you, yourself, or your firm did
15     not do any due diligence of Solo Capital?
16     A     To the best of my knowledge, no.
17     Q     Did your client group ever share
18     findings from their due diligence
19     investigation?
20             MR. DEWEY:  Objection.
21     A     Yes, I have a general recollection
22     they certainly reported orally to me and
23     perhaps to others in my firm, I don't know.
24     But certainly we had conversations to the
25     effect that, you know, Mr. Shah appeared to
```

1      be, you know, a reputable businessperson,

2      operating a licensed and properly regulated

3      financial institution out of the U.K., had a

4      pedigree of having worked with or been an

5      executive with major -- other major financial

6      institutions.

7              And I believe, as I said, there was

8      some report that I vaguely remember them

9      obtaining that I may have seen, but I can't

10     recall if they gave me a copy, but that

11     ultimately concluded that Mr. Shah and

12     Solo Capital were a bona fide and reputable

13     financial institution.

14     Q    Did they ever tell you what Solo

15     Capital's ratings were?

16     A    I don't recall specific

17     conversations one way or the other about

18     credit rating.

19     Q    Did they ever provide you with

20     Solo's financial statements?

21     A    I don't recall one way or the other

22     receiving financial statements of Solo.

23     Q    Did they ever tell you what the

24     financial wherewithal or strength of Solo

25     Capital was?

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

1          As I sit here now reviewing the
2   memo, I don't -- I can't say I understand it
3   necessarily the same way.  "Simultaneously"
4   refers back to the prior paragraph that lists
5   ten things that occurred.
6          I don't know as I sit here now to
7   which one or all of those things the word
8   "simultaneously" refers to.
9     Q    Let's leave aside this memo.
10         Did you have an understanding that
11  the plans bought the shares with money that
12  they got from a securities lending
13  arrangement?
14    A    I can't recall one way or the other
15  the details of the financing the plans
16  arranged.
17    Q    Did anyone tell you that in doing
18  these transactions, the plans would be
19  financing 100 percent of the purchase price?
20    A    I do generally recall having
21  conversations where it was explained that the
22  plans would be financing all of the purchase
23  price.
24    Q    So you understood that the plans
25  themselves would not need to have any money

1    in order to buy the Danish shares?

2              MR. DEWEY:  Objection.

3        A    I understood, generally, at the

4    time that the plans would be able to finance

5    their purchase of the Danish shares.

6        Q    100 percent?

7        A    That was my general understanding,

8    yes.

9        Q    So they would not need any of their

10   own cash in order to pay for any of the

11   Danish shares?

12       A    That was my general understanding.

13       Q    If we look at the next paragraph,

14   it starts, "As noted, while the decisions as

15   to which securities -- while the decisions as

16   to which securities to purchase are solely

17   within the purview of the Michelle plan

18   trustees, they did take into account the

19   recommendations of Solo."

20             Do you see that?

21       A    I do.

22       Q    What are the recommendations of

23   Solo that are referred to there?

24       A    I believe this refers to what I

25   mentioned earlier, that Solo would, through

CONFIDENTIAL
Michael Ben-Jacob — October 11, 2021

1    there's a paragraph that starts, "Under the

2    custodial agreement with Solo?"

3        A    Yes, I see that paragraph.

4        Q    It says, "The Michelle plan pays

5    fees to Solo as per the schedule attached to

6    the custodial agreement."

7            How did the -- let me take that

8    back.  Go to the next sentence.

9            It says, "The documents for the

10   transaction indicate that of the gross amount

11   payable to the Michelle plan, the Michelle

12   plan retained approximately 34 percent and

13   the remaining 66 percent was paid to Solo."

14           Was that consistent with your

15   understanding?

16       A    That was generally my

17   understanding, yes.

18       Q    And did any documents provide that

19   payments would be made to Ganymede?

20           MR. DEWEY:  Objection.

21       A    I don't recall one way or the

22   other.

23       Q    What documents provided that

24   payments would be made to Solo?

25       A    I don't recall what documentation

1    was put into place one way or the other with

2    respect to payments to Solo.

3        Q    Are you aware of any signed

4    agreement that provided that payments would

5    be made to Solo?

6        A    I don't recall one way or the other

7    what documentation was put into place with

8    respect to payments to Solo.

9        Q    Why did Solo simply recommend the

10   trades?  Why did the plans not simply appoint

11   Solo as the investment manager?

12            MR. DEWEY:  Objection.

13       A    I have a general and somewhat vague

14   recollection that there was a U.S. side

15   securities law issue that other attorneys in

16   my firm who were assisting with the matter

17   pinpointed, and recommended instead that the

18   ultimate decision for trading be placed in

19   the hands of the pension plan trustees and

20   not with Solo.

21       Q    Now, when you say, "the ultimate

22   decision," do you mean the decision as to

23   whether or not the plan would participate in

24   the transaction that Solo was recommending?

25       A    I believe what I meant was the -- I

```
 1        A    I don't recall the specific nature
 2   of the concern that they raised, only that
 3   there was a concern, and that the way to
 4   avoid the concern and be fully compliant from
 5   a U.S. regulatory standpoint was to proceed
 6   as we've described.
 7        Q    At the bottom of the page there's a
 8   paragraph that says, "While the documents
 9   provide that the 66 percent to Solo is a
10   quote, fee, unquote, to Solo, the
11   understanding of the parties at the time the
12   transaction was entered into was that Solo
13   and the Michelle plan were, instead,
14   effectively engaged in a partnership under
15   which the profits would be shared between
16   them under the above profit allocation, with
17   Solo being responsible for all of the
18   partnership's expenses."
19             Do you see that?
20        A    I do.
21        Q    Where that refers to the
22   "understanding of the parties" --
23        A    Yes.
24        Q    -- who is that referring to?
25        A    (Witness reviewing.)
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 116

```
1            I believe the paragraph says that
2    refers to Solo and the Michelle plan.
3        Q    And did you understand that was
4    fundamentally the business deal among your
5    client group and Solo, which was that there
6    would be a profit split with Solo of
7    approximately two-thirds at one-thirds
8    between their plans and Solo Capital?
9            MR. DEWEY:  Objection.
10       A    That was my general understanding.
11       Q    And where you did get that
12   understanding from?  Who gave you that
13   understanding?
14       A    To the best of my recollection,
15   that was based on conversations with the
16   client group.
17       Q    Did there come a time when the
18   profit split changed from about 66 percent,
19   34 percent, to a different split of
20   75 percent, 25 percent?
21       A    I can't recall one way or the
22   other.
23       Q    If we turn to the next page, 6,
24   this is a discussion of transactions with
25   qualified persons?
```

```
 1        A    With anyone.
 2        Q    Do you recall, sir, that your
 3   former clients wanted your help in setting up
 4   a number of partnerships, some 20 partnership
 5   agreements in 2012 to 2013?
 6             MR. DEWEY:  Objection.
 7        Q    As many as a dozen in February of
 8   2012?
 9        A    I don't recall the specific numbers
10   or the exact years, but I do generally recall
11   that during the trading period, a good number
12   of partnerships were requested to be formed.
13        Q    Now, what was the business reason
14   for all this activity in organizing these
15   partnerships in that 2012-2013 period?
16        A    I understood from the client group
17   that it had generally something to do with
18   their ability to trade on the Solo platform,
19   and that's what they indicated to me.
20        Q    And in order to do that, did you
21   draft partnership agreements that could be
22   used for plans accessing that platform?
23             MR. DEWEY:  Objection.
24        A    To the best of my recollection, we
25   did assist in the drafting of related
```

```
 1       A    I do.
 2       Q    Now, was that generally the
 3   approach to come up with a partnership
 4   agreement that would work for all of the
 5   partnerships?
 6            MR. DEWEY:  Objection.
 7       A    I believe and it's my general
 8   recollection that, yes, we created a form of
 9   partnership agreement with the general
10   intention that it would be used for each of
11   the pension plans.
12       Q    Then, if we turn to the next page,
13   at the top, you'll see an e-mail from Adam
14   LaRosa to you dated December 5, 2012.
15       A    December 5?
16       Q    Yeah.  It's at the top of the page
17   ending --
18       A    Oh, here it is.  It's the next
19   page.
20       Q    -- 880?
21       A    Yes, yes.  I have it.
22       Q    So the third sentence of
23   Mr. LaRosa's e-mail says, "We wanted each to
24   have perhaps only 5 percent interest, except
25   for Raubritter LLC Pension Plan, which should
```

CONFIDENTIAL
Michael Ben-Jacob — October 11, 2021

Page 129

```
 1    have 10 percent."
 2              Do you see that?
 3         A    I do.
 4         Q    And did you understand that with
 5    respect to the friends and families plans,
 6    the general rule was that the plan would have
 7    a 5 percent interest in the partnership, and
 8    95 percent would be with the other partners?
 9              MR. DEWEY:  Objection.
10         A    So just to make sure I understand
11    you, can you explain what you mean by "the
12    friends and family plans?"
13         Q    Did you understand that
14    Mr. Markowitz and Mr. Van Merkensteijn and
15    Mr. Klugman brought in friends or family
16    members to sponsor plans and to participate
17    in the Solo trading?
18         A    That was my general understanding,
19    yes.
20         Q    And did you understand, with
21    respect to those plans, they would be
22    5 percent partners in partnerships with your
23    former clients?
24         A    I don't recall the specific
25    allocation to those plans as opposed to other
```

```
 1    plans called the client plans one way or the

 2    other.

 3         Q    Do you recall the 5 percent -- the

 4    issue of 5 percent, whether plans could have

 5    a 5 percent interest in a partnership?

 6         A    I do generally recall that as being

 7    a U.S. pension law issue, yes.

 8         Q    Mr. LaRosa says, a little further

 9    down in the e-mail, "I believe there was some

10    tension around whether a 5 percent interest

11    was enough to get us comfortable."

12              Do you understand what that refers

13    to?

14         A    I believe I do.

15         Q    And what was that?

16         A    To the best of my recollection,

17    there's the question -- there was a question,

18    a U.S. tax pension law question, surrounding

19    whether, if a plan was a partner in a

20    partnership, what percentage of the

21    partnership profits needed to flow to the

22    plan in order for the plan to be the

23    beneficial owner of the -- of the income that

24    came to the partnership.

25         Q    How was that question addressed?
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

```
 1        A    I believe Arthur Woodard and
 2   Kathleen Wechter spent some time considering
 3   that issue.
 4        Q    And what was their conclusion?
 5        A    To the best of my recollection, I
 6   believe they concluded that a 5 percent
 7   interest -- I'm sorry.  I can't recall,
 8   actually, what they concluded.
 9             Yeah, I don't -- I don't remember.
10        Q    Do you recall any conclusion on the
11   subject of beneficial ownership by either
12   Mr. Woodard or Ms. Wechter?
13             MR. DEWEY:  Objection.
14        A    Yes.  I generally recall that there
15   was, you know, discussion about the U.S.
16   pension law concept of beneficial ownership,
17   and that Mr. Woodard advised the clients as
18   to what he believed an appropriate percentage
19   would be for the pensions' ownership in the
20   partnership.
21             I just can't recall what percentage
22   that was.
23        Q    Do you recall Kaye Scholer
24   concluding that the partnerships were the
25   beneficial owners of the securities for U.S.
```

CONFIDENTIAL
Michael Ben-Jacob – October 11, 2021

Page 132

```
1    tax and regulatory purposes?

2              MR. DEWEY:  Objection.

3         A    I don't recall that being the

4    conclusion.  I seem to recall that the

5    conclusion was that the pension plans were

6    the beneficial owners under U.S. pension law

7    rules and related tax rules.

8              But I can't say definitively.

9         Q    And who are the people who reached

10   that conclusion on beneficial ownership?

11        A    That conclusion would have been

12   Arthur Woodard and Kathleen Wechter.

13        Q    Anyone else?

14        A    None that I can remember right now.

15        Q    Mr. LaRosa's e-mail notes that

16   Raubritter was issued 10 percent.

17             Why was Raubritter different?

18        A    I don't know.

19        Q    Sir, if you could turn to Exhibit

20   3107?

21        A    Yes, I have it here.

22        Q    If you turn to the second page of

23   the document, sir, Bates number at the bottom

24   right is 727, if you see an e-mail from Peter

25   Wells, dated January 11, 2013, on which
```

1    Kathleen Wechter, I can't remember which, to

2    the effect that the partnerships, in order to

3    properly sponsor plans under U.S. pension

4    rules, needed to have some permanency, and

5    not be created and then dissolved in quick

6    succession.

7            And so it was his advice that

8    although the trading may have ceased, they

9    should continue to operate the partnerships

10   and conduct business within the partnerships

11   for purposes of continuing to be compliant

12   with the pension plan rules.

13       Q    And so you advised that your client

14   group should not terminate the partnerships,

15   even if there's no current business activity?

16           MR. DEWEY:  Objection.

17       A    That's what the e-mail says, yes.

18   Yes.

19       Q    And you noted that "among the many

20   issues that have been addressed is that the

21   plans must have been informed with the

22   intention of embarking on a permanent or

23   long-term business enterprise."

24           What did that mean?

25           MR. DEWEY:  Objection.

1  know, I just don't remember how the division

2  worked.

3       Q    Did you have an understanding at

4  the time?

5       A    I don't recall what my

6  understanding was at the time one way or the

7  other.

8       Q    Do you recall that the reclaim was

9  for the full amount of withholding tax that

10  had been withheld on Danish dividends?

11           MR. DEWEY:  Objection.

12       A    That was my general understanding.

13       Q    And did you understand that the

14  Danish tax was 27 percent of the dividend?

15       A    I can't recall now what my

16  understanding was then as to tax rate.

17       Q    In any event, if an application was

18  successful and a plan got a full refund of

19  the withholding tax, then that would be paid

20  to the payment agent, which would pay the

21  money over to the plan.

22           Right?

23       A    That's my general understanding,

24  yes.

25       Q    And that refunded portion of the

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

1    Danish dividend would then be subject to

2    apportionment among the parties in accordance

3    with their agreement to split the profits

4    two-thirds, one-third, Solo and the plan?

5         MR. DEWEY:  Objection.

6      A    My understanding as to the best I

7    can recollect right now was that the refund

8    amount was part of the gross proceeds from

9    which expenses were deducted.  And then,

10   again, and as I mentioned before, I don't

11   remember exactly how they came to their

12   ultimate division of two-thirds, one-third.

13     Q    But without getting into the ins

14   and outs, you understood that, overall,

15   two-thirds of the profits were going to Solo

16   and one-third was going to the plan?

17     A    That was my general understanding.

18     Q    That's fine.

19          MR. MAGUIRE:  Why don't we take a

20     break?  How long -- let's go off the

21     record.

22          THE VIDEOGRAPHER:  Stand by.  The

23     time is 12:49 p.m. New York time and

24     we're going off the record.

25          (Lunch recess taken.)

1                    How can I help you?

2          Q    Sir, if we look at that Paragraph 3

3      at the top of the second page, it says, "We

4      will look further at the issue discussed at

5      the outset of the meeting as to how the

6      funding of the transaction anticipated to be

7      a loan impacts the pension plan's

8      representation on the forms that it is the

9      beneficial owner of the tax reclaim amounts."

10                   Do you see that?

11         A    I do.

12         Q    Okay.  Did you understand that in

13     making a reclaim, the pension plan would

14     represent on the application form seeking the

15     reclaim that it is the beneficial owner of

16     the tax reclaim amount?

17         A    I have that general recollection,

18     yes.

19         Q    And can you tell us how -- just

20     explain this issue?  How did the funding of

21     the transaction impact that representation?

22         A    I don't have a recollection of this

23     specific e-mail exchange nor the, you know,

24     specific issue that's alluded to here.

25                   All this seems to say to me is

```
 1            I don't have any more than my
 2    general recollection at this time.
 3        Q    Did you see any problem with the
 4    plans making a representation to Denmark that
 5    they were the beneficial owners of shares
 6    when they were legally obligated to pay
 7    two-thirds of the reclaims to Solo?
 8            MR. DEWEY:  Objection.
 9        A    As I mentioned earlier, in
10    discussions with Jerome Lhote, he indicated
11    that he had taken advice from Danish counsel
12    and reported back to us, to me, that it was
13    appropriate to treat the pensions as the
14    beneficial owner for Danish law purposes.
15        Q    You understand that this Exhibit
16    4500 is a Danish law opinion?
17        A    I do understand that, yes.
18        Q    Given by a Danish law firm?
19        A    Yes, I understand that.
20        Q    And you understand that in this
21    opinion on Page 5, that Danish firm is saying
22    that a United States pension fund should be
23    regarded as the beneficial owner of the
24    Danish dividend if it is not legally
25    obligated to pay any portion of the dividend
```

1    to any person?

2            MR. DEWEY:  Objection.

3        A    I understand that those words are

4    on the page.  I don't have an interpretation

5    of those words beyond the conversations that

6    I had with Jerome Lhote, who, as I've

7    mentioned before, is himself an attorney, and

8    who represented to me that he coordinated the

9    advice with Danish counsel.

10       Q    Did Mr. Lhote tell you how Danish

11   counsel could conclude that the pension fund

12   was the beneficial owner, even if it was

13   legally obligated to pay a portion of the

14   Danish dividend to someone else?

15       A    As I mentioned earlier, I don't

16   recall the specifics of the conversation that

17   I had with Jerome Lhote.  I remember that we

18   generally had conversations on this topic.

19           I'll stop there.  Nothing further.

20           No further answer.

21       Q    Is it your understanding that

22   Mr. Lhote obtained a different opinion from

23   some different Danish lawyer?

24       A    Well, if I -- I'm not sure if I

25   understand your question correctly.  Your

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

```
 1        A    I think, as you know, I am not a

 2   Danish lawyer, so I can't speak to sources in

 3   Danish law.  I can say only that, at the

 4   time, we spoke to -- I spoke with Jerome

 5   Lhote who was, of course, an attorney

 6   himself, a civil law attorney at that, who

 7   represented to me that he had confirmed with

 8   Danish counsel that the plans at the time

 9   could make such a representation.

10           Today, you know, again, that would

11   be a point of Danish law that's beyond my

12   knowledge or expertise.

13        Q    So are you then telling us you're

14   not aware of any source of law that says that

15   an agent or nominee can be a beneficial

16   owner?

17           MR. DEWEY:  Asked and answered.

18        You can answer the question a third

19        time.

20        A    Again, today, I'm not a -- I'm not

21   a Danish lawyer and I'm not familiar with

22   Danish law today.  And at the time, we

23   relied -- I relied on and -- I relied on the

24   representations in this regard made to me by

25   Jerome Lhote.
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

```
 1    enough information to understand what this
 2    means.  This is lender's warranties.
 3            I don't understand in the document
 4    who the lender is.  I don't know what the
 5    words "full and legal and beneficial
 6    ownership" mean in the context of this
 7    document or its governing law, and in order
 8    to do so, I would have to, again, read the
 9    document from cover to cover, probably do
10    some research.
11            So I can't respond better.
12       Q    With respect to your conversation
13    with Mr. Lhote that he had gotten advice from
14    Denmark about beneficial ownership, when did
15    you have that conversation with Mr. Lhote?
16       A    I don't recall an exact date, but
17    it was certainly before -- as best as I can
18    remember, it was certainly before any reclaim
19    applications were submitted to the reclaim
20    agencies.
21       Q    And how do you know that?
22       A    Because I generally recall that the
23    onboarding documentation submitted to the
24    reclaim agencies asked that question.  And it
25    was that -- the review of those documents, as
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

1    Lhote, and in part, Matthew Stein.

2         Q    Sir, can you turn to Exhibit 4503?

3              MR. MAGUIRE:  Mark 4503.

4              (Whereupon the above mentioned was

5         marked for Identification.)

6         A    Yes, I have it here.

7         Q    Do you recognize your signature on

8    this document?

9         A    (Witness reviewing.)

10             This is not my signature on this

11   document.

12        Q    Whose signature is this?

13        A    The only person who was authorized

14   to sign my signature on these documents was

15   Peter Wells.

16        Q    So do you recognize this was Peter

17   Wells writing in your signature?

18        A    I don't recognize Peter Wells'

19   handwriting after all these years.  As I

20   mentioned, the only person authorized to sign

21   these documents on my behalf was Peter Wells.

22        Q    So do you have any reason today to

23   suppose that the signature here is anything

24   other than Peter Wells writing in per your

25   authority and signing for you?

```
 1       A    No, I do not have any reason to

 2  believe that it's anyone other than Peter

 3  Wells.

 4       Q    If we turn to the first page of the

 5  document, sir?

 6       A    Yes.

 7       Q    This is a Denmark beneficial owner

 8  declaration form.

 9            Is that correct?

10       A    It is.

11       Q    And near the top of this page, does

12  this form identify the beneficial owner as

13  the Omineca Pension Plan?

14       A    It does.

15       Q    And below that, are there general

16  declarations that start, "I hereby declare

17  that?"

18       A    I see that language, yes.

19       Q    And Item C is, "I am entitled to

20  the receipt of the dividend income shown on

21  the books and records of the institution

22  through which the related securities are

23  held."

24            Do you see that?

25       A    I do.
```

```
 1      Q    This is a "Statement of Beneficial
 2  Ownership and Beneficial Ownership
 3  Questionnaire."
 4           Is that correct?
 5      A    That is the title of the document.
 6      Q    And is that your signature on the
 7  document, on the page ending Bates 1839?
 8      A    That is not my signature on the
 9  document.
10      Q    Is that a signature that you
11  believe Peter Wells put on the document?
12      A    I believe that would be Peter
13  Wells' signature.
14      Q    And that would be pursuant to your
15  authority?
16      A    Yes, Peter Wells had my authority
17  to sign these documents.
18      Q    So what generally did you tell --
19  how did you give Peter Wells that authority?
20      A    As you will recall, there were a
21  number of plans and a fair number of
22  documents.  And given my own schedule and
23  other obligations and travel, I couldn't
24  always be in the office to sign documents.
25           So I reviewed a number of the
```

```
 1    here is our stab at 30 names for the LLCs."
 2            Do you see that?
 3       A    I do.
 4       Q    Did you participate with Mr. Wells
 5    in coming up with any of these names?
 6       A    I did not.
 7       Q    For all of the plans that were set
 8    up by these 30 LLCs, did they all use
 9    Kaye Scholer's mailing address?
10       A    I don't recall if all of them did.
11    I do generally recall a good number of them
12    did.
13       Q    And how did you handle the mail
14    that came in to these plans?
15       A    There was no special -- to the best
16    of my recollection, there was no special
17    arrangement for handling the mail.  The mail
18    went to the mailroom and then it was directed
19    to the attorney or administrator who handled
20    the matter.
21       Q    And who was that attorney or
22    administrator?
23       A    Peter Wells and Amy Gregory, who
24    was one of the legal assistants who was
25    working on the file at the time.
```

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

Page 237

1    you're submitting to Denmark are okay."

2        Q    Do you recall, in substance,

3    communicating that view to your client group?

4            MR. DEWEY:  Objection.

5        A    I generally recall, in substance,

6    communicating the view to the client group

7    that the firm was comfortable.  From a U.S.

8    tax pension regulatory perspective, the plans

9    were -- were the beneficial owners of the

10    Danish securities.

11        Q    And outside of that U.S. tax and

12    regulatory boundary, with respect to the

13    representations that were made to the Danish

14    government, with respect to those

15    representations, did you ever tell your

16    former clients that you or your firm were

17    okay, or words to that effect, with making

18    those declarations to Denmark?

19            MR. DEWEY:  Objection.

20        A    As I think I might have mentioned

21    in the past, we -- neither me nor my firm

22    gave advice on non-U.S. law except to the

23    limited extent that we had some of our

24    German -- of our colleagues in our German

25    office provide some advice on German law

1    Mr. Markowitz meant when he said that the

2    accounts will be held by the plan "as agent

3    or nominee for partnership?"

4        A    I don't recall this specific e-mail

5    exchange or any surrounding conversations,

6    and you would need to ask Mr. Markowitz what

7    he meant by that phrase.

8        Q    As you've testified today, sir, is

9    it your testimony that you do not have an

10   understanding of what Mr. Markowitz was

11   referring to here as the plan acting "as

12   agent or nominee for the partnership?"

13           MR. DEWEY:  Objection, asked and

14       answered.

15       A    I'm saying that I do not recall

16   this e-mail exchange or the surrounding --

17   any surrounding conversation, if any.  And I

18   can't say what I thought at the time of the

19   e-mail, and you would need to ask

20   Mr. Markowitz what he meant by that phrase.

21       Q    Did you or your firm file FBARs for

22   the partnerships as well as the plans that

23   engaged in Danish trading?

24       A    I don't recall specific entities

25   that we filed FBARs for, but I do recall

```
 1    generally that we assisted the clients in

 2    preparing any necessary FBAR filings.

 3         Q    And is it your understanding that

 4    the partnerships filed FBAR filings because

 5    the plans held their trading accounts as

 6    agents or nominees for the partnerships?

 7              MR. DEWEY:  Objection.

 8         A    I don't recall the specific

 9    entities that filed or did not file FBARs,

10    but it would make sense to me that the

11    partners, the partnerships filed FBARs

12    because mere signature authority over an

13    account outside the United States can trigger

14    an FBAR filing.  In the context of the FBAR

15    rules, it's referred to as an economic

16    interest, very similar to beneficial

17    ownership, for FBAR filings.

18         Q    So we discussed a little earlier

19    some individuals; Mr. Altbach, Mr. Lerner,

20    Mr. Zelman, Mr. Miller.

21              Do you recall that?

22         A    I recall those names, yes.

23         Q    Did you provide or your firm

24    provide any legal advice to any of those

25    individuals?
```

1           And I don't recall now what their

2    relationship was to Solo or what services

3    they were providing in the context of the

4    overall transaction.

5        Q    When the custody services were

6    spread among these four custodians, the

7    parties who were no longer using Old Park

8    Lane had to enter into a new custody

9    agreement.

10           Do you recall that?

11           MR. DEWEY:  Objection.

12       A    I can't recall now any of the names

13   that you mentioned other than Telesto nor do

14   I recall one way or the other what their

15   activities were and roles were in relation to

16   the overall transaction.

17       Q    Did you ever review the new custody

18   agreement for these custodians?

19       A    I don't recall one way or the other

20   whether I looked at those custody agreements

21   or not.

22       Q    Let me ask you to turn to Exhibit

23   1780?

24       A    Yes, I have it.

25       Q    You're not on this e-mail, sir, but

```
 1   sophisticated generally in tax and tax
 2   planning matters.
 3          And we have clients such as these
 4   who are extraordinarily sophisticated and
 5   well-versed, you know, and who themselves
 6   know as much or more than I do in many
 7   respects.
 8          So it's all over the map.
 9     Q    Sir, if you could turn to Exhibit
10   3111?
11     A    Yes, I have that.
12     Q    Is this an e-mail that
13   Mr. Markowitz sent to you on or about
14   September 4 of 2013?
15     A    The first e-mail is.  I just want
16   to read the chain.
17          (Witness reviewing.)
18          Yes.  How can I help you?
19     Q    Mr. Markowitz is responding to an
20   e-mail that you sent him on the same day in
21   which you say, "As I mentioned to Adam," and
22   after the parenthetical, it goes on to say,
23   "and while we still think the transactions
24   work, we don't think we can issue an opinion
25   that would be of real value."
```

1          Do you see that?

2      A    I do.

3      Q    Now, what did you mean by that?

4      A    While I don't recall this specific

5  e-mail exchange, I do generally recall

6  clients' requests that the firm consider

7  issuing a formal tax opinion related to the

8  tax -- the U.S. tax aspects of the

9  transaction.

10      Q    When you say "the U.S. tax

11  aspects," what tax aspects did they want the

12  opinion to address?

13      A    I generally recall and believe that

14  they were looking for a list of questions to

15  be answered.  And I can't remember the

16  specifics now, but I believe that some -- not

17  all, but some -- were addressed in -- excuse

18  me -- in the memo that we ultimately produced

19  for them.

20      Q    Is that the memo that we looked at

21  earlier dealing with disqualified persons and

22  prohibited transactions?

23      A    I believe so.

24      Q    You say here, "We wanted to have a

25  call to explain our thinking."

CONFIDENTIAL
Michael Ben-Jacob - October 11, 2021

```
 1              Is that right?

 2       A    Yes.

 3       Q    As of March 31 of 2015?

 4       A    That's the date on the form.

 5       Q    If we turn to the page with the

 6  Bates at the bottom 930?

 7       A    I have it.

 8       Q    There's a column on the right for

 9  "Purchases and Sales of Foreign Securities?"

10       A    Yes, I see that column.

11       Q    And under that, for "Foreign

12  Equities?"

13       A    Yes, I see that.

14       Q    And under that, for "Sales?"

15       A    Yes.

16       Q    And for the United Kingdom, the

17  plan discloses sales of $596 million.

18              Is that correct?

19       A    Yes.

20       Q    Then, if we go to the page with the

21  Bates at the bottom 937, it records a grand

22  total in terms of sales of foreign equities

23  of $596 million?

24       A    Yes, I see that.

25       Q    What was the threshold for filing a
```

1    Form S?

2        A    I do not now recall the specific

3    trading volume or value thresholds for the

4    various Federal Reserve forms, of which this

5    is one.

6        Q    Sir, if you could turn to Exhibit

7    2224?

8        A    Okay.  I have it.

9        Q    Is this an e-mail from

10    Mr. Markowitz on which you were copied from

11    April 9 of 2015?

12        A    It is.

13        Q    Mr. Markowitz says in the e-mail,

14    "Peter, here are the securities bought or

15    sold by the 40 pension plans as of March 31,

16    2015 for Form S."  He goes on to say, "As you

17    can see in the report, all exceeded

18    $350 million."

19            Do you see that?

20        A    I do.

21        Q    And if you turn to the next page,

22    you see the list of the 40 plans?

23        A    Yes.

24        Q    And all of the amounts exceed --

25    actually, all of the amounts exceed

1    $500 million.

2            Do you see that?

3        A    I do.

4        Q    So for these 40 plans, the total

5    value of securities here is in excess of

6    $20 billion?

7        A    I can't do the math that fast.  I'm

8    not going to attempt to tally this now.

9        Q    It's a lot of money.

10           MR. DEWEY:  Objection.

11       Q    Did you have an understanding as to

12   how these 40 plans were able to buy -- each

13   of them -- hundreds of millions of dollars of

14   Danish securities?

15       A    I understood generally that the

16   plans borrowed the money, financed the money,

17   to make the purchases.

18       Q    Did you understand that these were

19   all new plans?

20           MR. DEWEY:  Objection.

21       A    Well, I haven't -- I haven't

22   memorized the names of all the plans that

23   were created.  I don't know which on these

24   lists were new and which were not.

25       Q    Did you not understand that the

1    the client group had with their various

2    financial institutions.

3         Q    Did you ever ask anyone to explain

4    how a new plan with no more contributions

5    than the maximum permitted contribution of

6    $23,000 could afford to buy over $500 million

7    of Danish securities?

8              MR. DEWEY:  Objection.

9         A    I vaguely understood that they

10   could afford to buy the securities that were

11   traded because financial institutions agreed

12   to lend them or otherwise finance the money.

13        Q    And in this case, the financial

14   institution that was providing the money was

15   Solo or a party related to Solo.

16             Is that right?

17             MR. DEWEY:  Objection.

18        A    I don't have a recollection what

19   financial institution actually provided the

20   money as opposed to facilitated, you know,

21   obtaining the money.  Again, neither I nor,

22   to the best of my knowledge, anyone in my

23   firm were involved in anything but providing

24   the legal -- the U.S. legal advice related to

25   tax, pensions, and some regulatory matters.

CONFIDENTIAL
Michael Ben-Jacob - October 12, 2021

Page 399

1    or not.

2         Q    Do you recall the firm ever

3    advising you that representing Mr. Rivera

4    would cause an unwaivable business conflict?

5         A    I don't recall Mr. Rivera nor his

6    name, nor what inquiries he made of me or my

7    firm, one way or the other, if he made any,

8    or whether or not the firm indicated that

9    representing Mr. Rivera would be a business

10   conflict.

11        Q    Sir, if you could turn to Exhibit

12   3112.

13        A    I have that e-mail here.

14             I will read it.  Give me a moment,

15   please.

16             (Witness reviewing.)

17             I have briefly read through the

18   exhibit.

19             What is your question, please?

20        Q    Is this an e-mail on which you were

21   copied from Mr. Van Merkensteijn on or about

22   July 8, 2014?

23        A    Yes.  The first page of the exhibit

24   references such an e-mail.

25        Q    And at the bottom of the first

```
1    page, there's an e-mail from Mr. Wells to
2    Mr. Van Merkensteijn.  Right?
3         A    When you say "the first page" --
4    oh, I see -- yes, I see that, July 18, 2014
5    at 8:50 a.m.
6         Q    I think it's July 8?
7         A    I'm sorry.  Yes, July 8, 2014.
8         Q    Mr. Wells says, "John, after
9    further internal discussion and considering
10   the issues at play, further we confirm that
11   we do not recommend the co-trustee route
12   given the risk of a potential prohibited
13   transaction, notwithstanding Rich's
14   additional comments."
15             Do you see that?
16        A    I see those words, yes.
17        Q    And Mr. Wells says that "Between
18   the two suggested alternatives, the
19   authorized trader approach is preferred."
20             Now, how was this issue resolved?
21        A    I don't have a recollection of this
22   e-mail exchange nor conversations surrounding
23   this e-mail exchange nor what the specific
24   issues were.
25             I simply note that, as you go
```

```
 1    through the exhibit, the appropriate subject
 2    matter experts, Kathleen Wechter is
 3    referenced here with respect to issues
 4    touching on the pension plans, and I believe
 5    I saw a reference here as well to Steve
 6    Calahane on regulatory matters, yes.
 7              So I -- I can't recall other than
 8    to say that the appropriate attorneys with
 9    expertise were consulted.
10       Q    Now, if you turn to the second
11    page, there's a reference, I believe you
12    mentioned, to a Mr. Calahane, and
13    specifically that's in the last paragraph on
14    the page, the paragraph that starts with
15    "Respect to the professional investor issue."
16       A    I'm sorry.  When you -- what is the
17    Bates number on your page?
18       Q    Bates number 923.
19       A    Yes, I have that.
20       Q    And the second sentence says,
21    "Steven favors the co-trustee approach and
22    did not believe that it would implicate any
23    of the investment advisor issues.
24    Conversely, he raised concern with having
25    John or Rich appointed as authorized trader
```

CONFIDENTIAL
Michael Ben-Jacob — October 12, 2021

Page 402

1    or agent with investment discretion."

2              Do you see that?

3         A    I do.

4         Q    How was Mr. Calahane's concern

5    about the "authorized traitor or agent"

6    resolved?

7         A    As I think I mentioned, I don't

8    have a recollection of this e-mail exchange

9    nor the issues that were raised in the e-mail

10   nor any related surrounding conversations,

11   and I don't recall how those issues were

12   resolved other than to say that they were

13   referred to the appropriate attorneys.

14        Q    You had mentioned the Duet

15   transaction or Duet people yesterday.

16             Do you recall that?

17        A    I recall that we made mention of an

18   organization called Duet.

19        Q    And do you recall in the

20   transactions that the Duet organization

21   supported how much your former clients would

22   have had to put down to participate in the

23   transaction?

24             MR. DEWEY:  Objection.

25        A    I don't recall the specifics of the